No. 43,588

KIMBARK EXPLORATION COMPANY, a corporation, *Appellee,* v. CLEMENTINA VON LINTEL, a widow, *Appellee,* and NORBERT VON LINTEL and _____ VON LINTEL, his wife; ANGELIA RICHMEIER and B. J. RICHMEIER, her husband, et al., *Appellants.*

(391 P. 2d 55)

Opinion filed April 11, 1964.

*Edward Larson,* of Hays, argued the cause, and *Norman W. Jeter,* of Hays, appeared with him on the briefs for the appellants.

*F. F. Wasinger,* of Hays, argued the cause, and appeared on the briefs for the appellee, Clementina Von Lintel.

The opinion of the court was delivered by

HATCHER, C.: This appeal stems from a decree in a declaratory judgment action. The action sought a determination of the proper distribution of the landowner's one-eighth royalty, under a producing oil and gas lease, as between a life tenant and the remaindermen.

Neither the facts nor the issues are in dispute. They may be briefly stated.

Henry Von Lintel owned the Northeast Quarter (NE/4) of Section Two (2), Township Ten (10), Range Twenty-six (26), in Sheridan County, Kansas. On March 22, 1955, Henry Von Lintel and Clementina Von Lintel, his wife, executed an oil and gas lease covering the land described. Henry Von Lintel died July 12, 1957, leaving a will dated October 31, 1955, which devised his property to certain of his children, subject to the interest of

his wife, Clementina Von Lintel, "to have, hold, manage, and control the same and receive all the rents, income and profits therefrom to her use and benefit for and during her life." Sometime in June, 1960, after the admission of the will to probate, production was obtained under the oil and gas lease.

The plaintiff, the assignee and operator of the oil and gas lease, brought this action, alleging in detail the facts above stated, requesting the district court to adjudicate the rights of the royalty owners to the one-eighth royalty accrued and accruing under the lease, and to render a declaratory judgment as to such rights and obligations. Attached to the petition was a copy of the will but it contains no language that will aid in the determination of this controversy.

The remainderman answered claiming that all of the landowner's royalty should be deemed principal under the will of Henry Von Lintel; that it should be invested; that the income therefrom should be paid to the life tenant during her natural life, and that upon her death the principal should be distributed to the remaindermen.

The life tenant answered claiming that all of the proceeds of the one-eighth royalty which had accrued or may accrue during her lifetime belong to and should be paid to her.

The case was presented to the trial court on the undisputed facts alleged in the pleadings which we have abbreviated.

The district court entered judgment decreeing insofar as material to this controversy:

"That the defendant, Clementina Von Vintel, is entitled to all of the one-eighth (1/8th) royalty under the present existing oil and gas lease . . . during the lifetime of the said Clementina Von Lintel, and the same be and hereby is assigned to the said defendant, Clementina Von Lintel, for and during her lifetime; That all of the one-eighth (1/8th) royalty that has accrued, or will accrue, under said lease, shall be paid to the said Clementina Von Lintel forthwith by the said plaintiff herein, and shall further be paid as the same accrues during the lifetime of the said Clementina Von Lintel."

The plaintiff, the producer under the oil and gas lease, being interested only in to whom it should pay the one-eighth royalty has not participated in the appeal. The defendants remaindermen, hereinafter designated as appellants, have appealed challenging the decision of the district court. The defendant, the life tenant, hereinafter designated as appellee, has appeared supporting the decision of the district court.

Although the answer may be difficult, the contention of the parties on appeal may be simply stated.

The appellee contends that, under the rule announced by this court, the life tenant, in the absence of a contrary intention manifested by the instrument creating the life estate, is entitled to all royalties from wells brought into production after the commencement of the life estate but under authority granted, through lease or otherwise, by the person who created the life estate.

The appellants contend that regardless of the rule previously existing in this state the legislature in 1951 by the enactment of the Uniform Principal and Income Act, particularly G. S. 1961 Supp., 58-909 pertaining to disposition of natural resources, set up a different rule which now governs the matter. The appellee answers with the suggestion that the Uniform Principal and Income Act did not purport to change the existing Kansas law.

The general rule followed by this court is stated in 31 C. J. S. Estates § 42 beginning on page 78 as follows:

"Under the open mine or open well doctrine, when not expressly precluded, a life tenant may work or have operated a mine, quarry, or well, opened before the creation of his estate, even to exhaustion; and not only for his own use but for profit; and is entitled to all proceeds derived from such operation without being obliged to make provision for any fund to offset depletion. The rationale of the open mine doctrine is that the owner of the previous estate by opening mines on the land impresses it with that character of use and enjoyment, and, in the absence of a provision to the contrary in the instrument creating the life estates, manifests an intention that the life tenant may likewise use and enjoy the land."

The above statement covers the situation where production of oil or gas or other minerals existed on the land at the time the life estate took effect. The statement continues covering the situation where the settlor authorized the development before the life estate took effect but development did not take place until after the life estate came into being. The statement reads:

"Where the owner of a preceding estate of inheritance authorizes a mine or well to be opened or drilled on his land, and such mine or well is not opened or drilled until after his death, the mine or well will be considered an open mine or well as of the date of the owner's death, and the life tenant is entitled to receive the royalties as issues and profits of the land. Mining by the life tenant will be allowed if the former owner of the fee has impressed on it the character of mining land, by executing an enforceable lease for that purpose prior to the commencement of the life estate, although no mines have been opened thereunder until after the commencement of the life estate. Where an oil or gas lease has been

executed prior to the inception of the life estate, the life tenant is entitled to all accruing royalties although actual drilling operations do not commence until after the inception of the life estate. If a lessee of an oil and gas lease enters after lessor's death and drills and produces oil and gas, the wells will be regarded as open at lessor's death, and the life tenant will be entitled to the rents and profits reserved to lessor, accruing therefrom, during the life tenancy . . ." (p. 79. See, also, 33 Am. Jur. Life Estates Remainders, etc., § 330, p. 834.)

The trade term "open mine or open well doctrine" as used in the quotations simply means that a mine is being operated or an oil or gas well is producing. The term has also been extended to cover a situation where the production was authorized by the landowner before the life estate was created even though production had not yet commenced.

As one of the authorities for the above statement, the author cites *Benson v. Nyman*, 136 Kan. 455, 16 P. 2d 963 where this court held:

"While a life tenant under a will may not develop an oil and gas property to the deprivation of remaindermen, such rule does not apply where all developments were made under and by virtue of the provisions of a lease made by the landowner in his lifetime with a third party as lessee." (Syl. 2.)

This court again recognized the general rule and distinguished between an oil and gas lease made by the settlor and one made by the life tenant in *Burden v. Gypsy Oil Co.*, 141 Kan. 147, 40 P. 2d 463 where it held in syllabus 5 as follows: "A life tenant may not develop an oil and gas property to the deprivation of the remaindermen where the development was not begun or authorized before the commencement of his life estate."

This court again recognized the rule in *Pedroja v. Pedroja*, 152 Kan. 82, 102 P. 2d 1012, where it stated on page 90 of the opinion:

". . . Based on finding five, the court held that the life tenants were entitled to share in the royalties from leases executed by the testator in his lifetime, but that on the leases executed subsequent to his death, the royalties therefrom are to be invested and the life tenants are entitled to the income from such investments. The correctness of the rule is not questioned . . ."

Those who desire to research the general rule above announced as applied in other states may see *Mairs v. Trust Co.*, 127 W. Va. 795, 34 S. E. 2d 742; *In re Shailer's Estate*, Okl., 266 P. 2d 613; *Youngman v. Shular*, 155 Tex. 437, 288 S. W. 2d 495, and *Barton v. Warner*, (Tex. Civ. App.) 142 S. W. 2d 303.

The Kansas cases cited above were decided prior to the enact-

ment of the Uniform Principal and Income Act in 1951. This court has not had occasion to pass upon the effect of the act on the general rule as previously announced by this court. Neither have we found any cases in which the courts of other states have had occasion to pass on or interpret the provisions of the act and none have been cited in the briefs. The provision covering disposition of income from natural resources is to be found in G. S. 1961 Supp., 58-909, which provides:

"Where any part of the principal consists of property in lands from which may be taken timber, minerals, oils, gas or other natural resources and *the trustee or tenant is authorized by law or by the terms of the transaction by which the principal was established to sell, lease or otherwise develop such natural resources,* and no provision is made for the disposition of the net proceeds thereof after the payment of expenses and carrying charges on such property, such proceeds, if received as rent on a lease, shall be deemed income, but if received as consideration, whether as royalties or otherwise, for the permanent severance of such natural resources from the lands, shall be deemed principal to be invested to produce income. Nothing in this section shall be construed to abrogate or extend any right which may otherwise have accrued by law to a tenant to develop or work such natural resources for his own benefit." (Emphasis supplied.)

It would appear that the statute only attempts to cover a situation where the trustee or life tenant makes the lease or otherwise develops the natural resources. The situation where the settlor of the life estate has made the lease or otherwise developed the natural resources is noticably omitted.

The uniform principal and income act was adopted by the National Conference of Commissioners on Uniform State Laws in 1931, although not adopted by the legislature of this state until 1951. In the California Law Review, Volume 28, beginning at page 44, written in 1939, we find the following statement dealing with the section in question:

"Referring, then, first to section 10, which deals with the related topic of principal subject to depletion, the Act there adopts the orthodox rule that the returns from wasting assets are principal if the trustee is under a duty to convert, but where the trustee is under no duty to convert the returns are income. Section 9 abandons this test and lays down a rule apparently new, which applies *only where 'the trustee or tenant is authorized . . . to sell, lease or otherwise develop such natural resources . . .'* If these conditions exist—*and no provision is made for cases where they do not exist*—then the net proceeds, if received as rent on a lease, are income, but if received as consideration, whether as royalties or otherwise, for permanent severance, are principal . . ." (Emphasis supplied.)

A note by the committee drafting the Uniform Principal and

Income Act throws some light on the scope and intent of the section in question. In the Hand Book of the National Conference of Commissioners on Uniform State Laws and Proceedings, 1928, at page 215, we find the following note made while the section was being developed:

". . . In general a tenant is not entitled to make merchandise of standing timber. . . . Or to open mines or oil wells Eager v. Pollard, 194 Kentucky 276, 239 S. W. 39 (1922) reported with a note in 43 A. L. R. 808, 811; 36 L. R. A. N. S. 1108 citing cases."

In the Pollard case cited in the above quotation it is stated:

". . . Royalties derived from oil wells opened up upon land after the death of the owner and not in pursuance of a contract executed by him, usually are considered as part of the corpus of the estate and not as income therefrom as between life tenants and the remaindermen. Crain v. West, *supra*; Meredith v. Meredith, 193 Ky. 192.

"Mineral wells that are opened up after the death of the fee owner, but in pursuance of an express or implied power conferred by his will are not distinguishable from those opened after his death in pursuance of a contract, and in several such cases royalties realized therefrom very properly, it seems to us, have been held in other jurisdictions to be income. See Thornton on Oil & Gas, vol. 1, section 301, and cases there cited.

"But this could not result of course where the testator by the will conferring the power provided otherwise with reference to the disposition of the funds derived thereunder." (l. c. 278.)

It is apparent that the committee had the general rule before it and was considering only the situation where the development or production was not authorized before the life estate came into being. If the committee was following the Pollard case it could not have intended to include a situation where the right to develop and produce was authorized by the landowner before the life estate was in being. The case on which they were relying for their authority would be to the contrary.

We are forced to conclude that the rule announced by this court to the effect that, "while a life tenant under a will may not develop an oil and gas property to the deprivation of remaindermen, such rule does not apply where all developments were made under and by virtue of the provisions of a lease made by the landowner in his lifetime with a third party as lessee," has not been changed or affected by the provisions of G. S. 1961 Supp., 58-909.

In the case under consideration the development took place under a lease made by the landowner before the life estate came

into being. The proceeds from the one-eighth royalty therefor belong to the life tenant.

The judgment is affirmed.

APPROVED BY THE COURT.

FATZER, J., dissents: Since the question presented is one of first impression in this state and since it deals with the construction of a statute relating to the disposition of proceeds from our natural resources, I must express my disagreement with the court's affirmance of the judgment.

Reduced to its simplest terms, the question presented is whether the proceeds of royalty from an oil and gas lease is income to which a life tenant under a will is entitled, or whether it is principal to be invested and conserved for remaindermen, with only the interest thereon being payable to the life tenant.

Had the decedent, Henry Von Lintel, showed a clear intention in his last will and testament with respect to the distribution of the proceeds from oil and gas leases, or from the permanent severance of natural resources, such intention would be controlling. (G. S. 1961 Supp., 58-902; Anno: Mineral Lease-Rights in Royalty, 18 A. L. R. 2d 104.) But the decedent's will contained no provision for the disposition of royalties as it states that the life tenant is to have the "rents, income and profits" from the testator's real estate during her lifetime. If any intention could be gathered from the decedent's will, it would be that the life tenant's interest did not include "royalties," but was limited to income from the real property. Royalties from oil and gas leases are not entirely like rents received under an ordinary agriculture lease; they are compensation for the grant to the lessee of privileges with respect to the land and the minerals therein—compensation for rights carved out of the full ownership held by the lessor—by a contract employing the usual means by which the owner of land underlaid by oil and gas realizes upon that part of his property. (*Miller v. Sooy*, 120 Kan. 81, 83, 242 Pac. 140.) In the absence of any clear intention on the part of the testator, the court must look to the statutory rule enacted to govern under these circumstances. (G. S. 1961 Supp., 58-901, *et seq.*)

It is hornbook law that a grant of a life estate by its nature creates a limitation on the estate of the life tenant and establishes the rights of remaindermen. In *Windscheffel v. Wright*, 187 Kan. 678, 360 P. 2d 178, 89 A. L. R. 2d 636, it was held that the relation

of a life tenant to a remainderman is frequently termed that of a trustee or *quasi* trustee; that the life tenant is a trustee in the sense that he cannot injure or dispose of the property to the injury of the rights of the remainderman, but he differs from a pure trustee in that he may use the property for his exclusive benefit and take all the income and profits. In the absence of language or circumstances to the contrary, the court presumes the testator intended that the life tenant and remainderman should enjoy his bounty equally and that the natural resources should not be "swallowed up" by the life tenant's use or enjoyment thereof, leaving little or nothing to the remainderman. The severance of oil and gas in place is in effect the sale or disposition of a portion of the land (*Lathrop v. Eyestone,* 170 Kan. 419, 227 P. 2d 136) and a life tenant has no right to exploit such natural resources of the property for his own benefit. (*Burden v. Gypsy Oil Co.,* 141 Kan. 147, 153, 40 P. 2d 463.)

In 1931 the National Conference of Commissioners on Uniform State Laws attempted to remedy the inequities of the common-law rule allowing complete exhaustion of natural resources by a life tenant to the exclusion of remaindermen, when it drafted and approved the Uniform Principal and Income Act. The act was adopted by our legislature in 1951 (G. S. 1961 Supp., 58-901, *et seq.*) to provide rules governing "the ascertainment of principal and income, and the apportionment of receipts . . . between tenants and remaindermen," in all cases except where the person establishing the "principal" directed the apportionment. (G. S. 1961 Supp., 58-902.) No one questions the fact that once such a statute is enacted, its provisions govern the question presented to the exclusion of any prior case law or common-law rules to the contrary. In *Williams v. City of Wichita,* 190 Kan. 317, 374 P. 2d 578, it was said:

". . . From the earliest days of Kansas history, flexibility in the common law has been carefully preserved (G. S. 1949, 77-109). Indeed, the great office of statutes is to remedy defects in the common law as they are developed and to adapt it to the changes of time and circumstances. That the legislature may change the principle of the common law and abrogate decisions made thereunder when in its opinion it is necessary to the public interest is well settled. . . ." (l. c. 331.)

The Uniform Principal and Income Act was adopted prior to the establishment of any of the interests involved in this case, and I am in accord with the majority opinion that 58-909 relating

specifically to the disposition of natural resources is controlling, but in addition to that section other sections must be considered if the intent and purpose of the act is to be ascertained. Hence, I quote pertinent sections of the act.

" 'Principal' as used in this act means any realty or personalty which has been so set aside or limited by the owner thereof or a person thereto legally empowered that it and any substitutions for it are eventually to be conveyed, delivered or paid to a person, while the return therefrom or use thereof or any part of such return or use is in the meantime to be taken or received by or held for accumulation for the same or another person;

" 'Income' as used in this act means the return derived from principal;

" 'Tenant' as used in this act means the person to whom income is presently or currently payable, or for whom it is accumulated or who is entitled to the beneficial use of the principal presently and for a time prior to its distribution;

" 'Remainderman' as used in this act means the person ultimately entitled to the principal, whether named or designated by the terms of the transaction by which the principal was established or determined by operation of law;

" 'Trustee' as used in this act includes the original trustee of any trust to which the principal may be subject and also any succeeding or added trustee." (58-901.)

"This act shall govern the ascertainment of income and principal, and the apportionment of receipts and expenses between tenants and remaindermen, in all cases where a principal has been established with or, unless otherwise stated hereinafter, without the interposition of a trust; except that in the establishment of the principal provision may be made touching all matters covered by this act, and the person establishing the principal may himself direct the manner of ascertainment of income and principal and the apportionment of receipts and expenses or grant discretion to the trustee or other person to do so, and such provision and direction, where not otherwise contrary to law, shall control notwithstanding this act." (58-902.)

"Where any part of the principal consists of property in lands from which may be taken timber, minerals, oils, gas or other natural resources and the trustee or tenant is authorized by law or by the terms of the transaction by which the principal was established to sell, lease or otherwise develop such natural resources, and no provision is made for the disposition of the net proceeds thereof after the payment of expenses and carrying charges on such property, such proceeds, if received as rent on a lease, shall be deemed income, but if received as consideration, whether as royalties or otherwise, for the permanent severance of such natural resources from the lands, shall be deemed principal to be invested to produce income. Nothing in this section shall be construed to abrogate or extend any right which may otherwise have accrued by law to a tenant to develop or work such natural resources for his own benefit." (58-909.)

Whether this court has previously adopted the "open mine" or the "unopen mine" common-law rule or doctrine is not a question

requiring decision in this case. That is purely academic since this litigation must be decided by the terms of the act. Nor can I agree with the majority opinion "that the statute only attempts to cover a situation where the trustee or life tenant makes the lease or otherwise develops the natural resources." It is well settled that a life tenant has no right to exploit the gas and oil resources of the property for his own benefit, or to authorize by lease or otherwise, another to do so, where the lease was not executed or development begun until after the commencement of his life estate. (*Benson v. Nyman*, 135 Kan. 455, 16 P. 2d 963; *Burden v. Gypsy Oil Co.*, supra; *Fourth & C. Tr. Co. v. Woolley*, 31 Ohio App. 259, 261, 165 N. E. 742; 43 A. L. R. 811; 18 A. L. R. 2d 104.) If, however, the life tenant and the remaindermen join in an oil and gas lease, they may agree as to the division of the royalties, and in the absence of such an agreement, the life tenant is entitled either to have the royalties invested and receive the income therefrom, or to receive an apportionment of the royalties dependent upon the value of his expectancy. (*Burden v. Gypsy Oil Co.*, supra.) The Uniform Act was intended to remove any distinction with respect to the division of "royalties" regardless of when the oil and gas lease was executed on property devised to one for life with remainder over in fee where production was begun after the commencement of the life estate.

The word "principal" is defined in 58-901 as any realty which has been set aside or limited by the owner—here the testator—to be delivered to a person—in this case the life tenant—for the term of her natural life. Thus, the real property here involved, the "principal" referred to in 58-909, from which oil, gas or other natural resources are produced, was devised by the testator to the defendant widow subject to the oil and gas leases and was limited for her use during her lifetime without direction as to the distribution of royalty proceeds from oil and gas leases. The phrase "by the terms of the transaction by which the principal was established" can only mean the decedent's will. It was that instrument which established the life estate and the remainder estate in fee, and I think it is clear that the oil and gas leases executed by the testator in his lifetime did not do so. The terms of the transaction by which the "principal" was established, that is, the life estate in the real property, was created solely by the decedent's will and there is nothing in that instrument which is any guide to the court in determining the intention of the testator

with respect to the disposition of the royalty proceeds in question. In fact, the majority opinion concedes this fact when it states: "The will . . . contains no language which will aid in the determination of this controversy."

Although 58-909 is lacking in clarity, it is my opinion that its intent and purpose is to prescribe a rule in all cases where a testator devises real property to one for life with remainder in fee to others and fails to apportion the royalties between the two estates from oil, gas or other natural resources produced after his death pursuant to a lease executed by him during his lifetime. In that event the proceeds are received as consideration or compensation for the right to drill and produce the natural resources, and are deemed to be principal as defined in 58-901 to be invested to produce income to be paid to the life tenant pursuant to 58-909. (28 California Law Review, The Uniform Principal and Income Act, pp. 44, 45.)

The fact that the decedent's will contained no language authorizing the life tenant to execute oil and gas leases or to otherwise develop the natural resources is not persuasive since the act was intended to govern the ascertainment of income and principal, and the apportionment of receipts between a life tenant and the remaindermen in all cases where the "principal" was established subject to the right to drill and produce oil and gas by the lessee without the testator directing the manner of the apportionment of receipts between the two estates. (G. S. 1961 Supp., 58-902.) As I view the act, it becomes immaterial, under the facts and circumstances of this case, when or under what circumstances the testator executed the oil and gas leases where production occurred after his death. The term "royalty" in its ordinary meaning is that part of oil and gas payable to the lessor by the lessee out of oil and gas actually produced and saved. It is the compensation or consideration to the lessor provided in the lease for the lessee's privilege of drilling and producing oil and gas. It does not include a perpetual interest in or to the oil and gas in place. (*Bellport v. Harrison,* 123 Kan. 310, 255 Pac. 52; *Rathbun v. Williams,* 154 Kan. 601, 121 P. 2d 243; *Hickey v. Dirks,* 156 Kan. 326, 330, 133 P. 2d 107.) Clearly, royalty proceeds are not received as rent on an oil and gas lease, but are received as compensation or consideration for the permanent severance of the natural resources from the land within the mean-

ing of 58-909, and are to be deemed principal to be invested to produce income for the use of the life tenant.

The over-all purpose of the Uniform Act was to provide a just and fair rule which would protect the remaindermen's interests as well as provide the life tenant an income, without depriving the remaindermen of any benefit or ownership of the sale of a portion of their interest of the real estate in fee. I cannot import to the legislature an intention to ratify and confirm a rule of property law which the majority opinion states this court has adopted, but, rather, I view the Act as a legislative declaration, in the absence of a settlor's or testator's direction otherwise, to make the severance of oil, gas and other natural resources principal, to be invested to produce income for the life tenant for her life and upon her death, to be distributed among the fee simple owners. I would reverse the judgment of the district court.