No. 38,066

CHARLES F. LATHROP, *Appellant*, v. (Cline V. Eyestone and Bernice Eyestone, his wife, et al., Defendants) STANDISH HALL, Trustee, and THE FIRST NATIONAL BANK IN WICHITA, a corporation, Trustee, *Appellees*.

(227 P. 2d 136)

Opinion filed January 27, 1951.

*John P. Flinn*, of Newton, argued the cause, and *Alden E. Branine, C. Fred Ice*, and *Lelus Brown*, all of Newton, were with him on the briefs for the appellant.

*L. J. Bond*, of El Dorado, argued the cause, and *R. M. Bond*, of El Dorado, was with him in the briefs for the appellees.

The opinion of the court was delivered by

WEDELL, J.: This was an action against various defendants to quiet title to certain lands.

The action was tried by the court on an agreed statement of facts. The only defendants now involved are Standish Hall, trustee, and The First National Bank in Wichita, a corporation, trustee. The title of the plaintiff was quieted as to all defendants except the two last mentioned. Judgment was rendered in favor of those two defendants pursuant to their respective claims based on certain written instruments executed and delivered by former owners of the fee title, and plaintiff, the present owner of the fee title, appeals.

It is agreed the plaintiff, Charles F. Lathrop, is the present owner of the fee title to the lands involved subject to such interest as the two mentioned defendants may have in the lands, if any.

The primary question presented is the nature, character and effect of the written instruments pleaded and relied on by these two appellees. For convenience appellees will be referred to as Hall and as the bank. Although neither Hall nor the bank was a grantee in the original instruments involved it is admitted they are now trustees of whatever right, title or interest may have been granted thereby. We shall first set forth the pertinent parts of the two conveyances on which Hall relies. One of them reads:

"THIS AGREEMENT made and entered into this 22nd day of April, 1919, by and between Frank E. Eyestone and Mamie E. Eyestone, his wife, assignors, parties of the first part and The Guarantee Title and Trust Company, assignee, party of the second part.

"WITNESSETH, that whereas, on the 17th day of Sept. 1918, a certain oil and gas lease was made and entered into by and between the said Frank E. Eyestone and Mamie E. Eyestone his wife, lessors, and J. A. Crawford, lessee, wherein said lessors leased to said lessee for himself his heirs and assigns for oil and gas mining purposes for the terms designated therein and under the

conditions thereof, the following described land located in Butler County, Kansas, to-wit:

"The North Half of the Southwest Quarter (N½ of SW¼) and the Southwest Quarter of the Northwest Quarter (SW¼ of NW¼) of Section Eight (8), in Township Twenty-three (23), Range Four (4) East of the Sixth P. M.

and which said lease is recorded in Book Misc. 41 page 53 in the office of the Register of Deeds of Butler County, Kansas, and provides that the lessee his heirs, and assigns, shall under the conditions of the premises depart of all oil produced and saved from said leased land and shall pay to the lessor, his heirs or assigns, one-eighth (⅛) of all gas produced and saved from said leased land or in lieu thereof said one-eighth (⅛) of the gas, $200.00 for each gas well drilled thereon where gas only is found while the same is being used off the premises.

[Here appears paragraph of assignment to The National Refining Company.]

"Now, THEREFORE, Be It Remembered, That, we Frank E. Eyestone and Mamie E. Eyestone, his wife, the undersigned, in and for the consideration of One Dollar ($1.00) and other valuable consideration to us in hand paid by The Guarantee Title & Trust Company, the receipt of which is hereby acknowledged have sold and by these presents do sell, assign and deliver to the said Guarantee Title and Trust Company, their successors and assigns, an undivided one-fourth (¼) interest in and to all of the oil and gas right, title and claim, we now own or which we may hereafter be entitled under and by virtue of the above and described aforesaid lease or any oil and gas lease existing or which may hereafter exist upon the above described land or any part thereof, including all of the oil and gas, rent and royalties now accrued or accrue hereafter, also a perpetual and irrevocable right, privilege and license to enter upon said land or any part thereof and prospect for and drill wells for oil and gas therein or thereon, and also the right to use and the possession of so much of said premises as may be necessary to enable the assignee herein, their successors or assigns, to carry out the purpose and provisions of this grant, provided that this clause does not in any way interfere with the lease on the above described premises.

"PROVIDED, That the grantors herein their heirs or assigns upon payment to the grantee herein; its successors or assigns of an amount equal to three-fourths (¾) of the expense and cost of producing and disposing of such oil and gas, shall thereupon forthwith be entitled to and shall receive from said grantee, their successors or assigns, an equal amount to three-fourths (¾) of the net profits arising from the sale and disposition of said oil and gas as aforesaid, but in any event the grantor is not to be held for any expense in the last clause, unless it is taken from the oil and gas produced on said premises."

The other instrument relied on by Hall, dated May 5, 1919, reads in part:

"ASSIGNMENT OF ROYALTY

"KNOW ALL MEN BY THESE PRESENTS: That Ethel Johnson, a single woman, and George Johnson, a widower, of the first part, in consideration of One Dollar, and other valuable considerations, the receipt of which is hereby acknowledged, have granted, bargained, sold and conveyed and do by these presents grant,

bargain, sell, and convey unto W. H. Stanley of Wichita, Kansas, party of the second part, an undivided one-fourth (¼) *in a certain oil and gas mining lease,* executed by said Ethel Johnson, a single woman, and George Johnson, a widower, to E. E. Johnson, the North Half of the Northwest Quarter (N½ of NW¼) of Section Nine (9) Township Twenty-three (23) South, in Range Four (4) East of the Sixth Principal Meridian, in Butler County, Kansas, containing eighty acres, more or less according to government survey, which lease is dated October 30th, 1918; also

"An undivided one-fourth (¼) interest in any and all bonuses received for oil and gas lease or leases hereafter executed by first parties or their assigns, upon said real estate, or any part thereof, and one-fourth (¼) of the oil and gas *royalties reserved to the lessors* in any such lease or leases hereafter executed; it being expressly understood and agreed that when said present oil and gas lease terminates parties of the first part, or their assigns, shall have the full and exclusive right to execute another oil and gas lease or leases as herein provided; which one-fourth (¼) of the royalties shall not be less than one-sixteenth (1/16) of the *production of the lease.*" (Our italics.)

The pertinent part of the conveyance on which the bank relies reads:

"DECLARATION OF TRUST

"THIS AGREEMENT made and entered into this 12th day of June, 1919, between Frank E. Eyestone and Mamie Eyestone, his wife, parties of the first part and The Prudential Trust Co., a corporation, organized under the laws of the State of Kansas, party of the second part, hereinafter called the Trustee.

"WITNESSETH, That the parties of the first part in consideration of One Dollar to them paid by the second party, the receipt whereof is hereby acknowledged, do by these presents, grant, bargain, sell and convey to the party of the second part an undivided one-half in a one-eighth oil and gas royalty reserved to them on the North Half of the Southwest Quarter of Section 8, and the Southwest Quarter of the Northwest Quarter of Section 8, in Township 23, Range 4 East of the 6th Principal Meridian, in Butler County, Kansas, in a certain oil and gas mining lease, executed by the parties of the first part to The National Refining Co., and now of record in the office of the Register of Deeds of Butler County, Kansas; also an undivided one-half interest in any and all bonuses received from any oil or gas lease or leases hereafter executed by the parties of the first part or their assigns upon said real estate or any part thereof and one-half of the oil and gas, reserved to the lessors in any such lease or leases hereafter executed; it being expressly understood and agreed that when the said oil and gas lease terminates, the parties of the first part or *their assigns shall have* full and exclusive right *to execute another oil and gas* lease or leases on said premises, subject only to the rights of the second party to whom half of the bonus received and an oil and gas royalty of one-sixteenth of the oil and gas produced and saved from said premises.

"To HAVE AND TO HOLD THE SAME, Unto the party of the second part in trust for the said Frank Eyestone and for the beneficiaries of this Trust as hereinafter provided.

"FIRST:

" 'The aforesaid *royalties* and rights herein assigned to the Trustee shall be divided into six thousand units, each representing a one-sixth thousandth interest therein, which units shall be evidenced by certificates to be issued by the Trustee on the order of Frank E. Eyestone, his heirs or assigns.

"SECOND:

" 'The interest of each beneficiary shall be evidenced by one or more certificates to be executed by the Trustee in the following form:

"EYESTONE'S OIL AND GAS ROYALTY TRUSTEE'S CERTIFICATE

" 'This is to certify that _____ is the owner of _____ six-thousandths interest in a one-sixteenth *oil and gas royalty* on the following described premises, situate in the County of Butler and State of Kansas, to-wit: [Description of property same as previously shown.] . . .

"FOURTH:

" 'Such units *shall be deemed personal property* and neither the beneficiary nor in case of his death, insolvency or bankruptcy shall his representative or any other person be entitled to partition or to an accounting but the ownership of such units shall be by succession.' " (Our italics.)

Hall contends the first two instruments above set forth constitute grants of oil and gas in place. The bank makes the same contention relative to the last instrument, on which it relies. The trial court sustained both contentions. The appellant owner of the fee title contends none of the three instruments constitutes such a grant and that each of them is merely a conveyance of an interest in royalty, oil and gas produced and saved.

Before examining the instruments it may be helped to restate a few well established principles.

As we have frequently stated the term "royalty" is often rather loosely and inaccurately used by men in the petroleum industry, those dealing in oil and gas holdings and at times by attorneys. Some persons refer to oil and gas in place as royalty. Others refer to royalty as the landowner's share in production. We have, therefore, repeatedly held the true nature and character of the instrument is not to be determined by the name or label attached thereto but by its intent as reflected by the terms, the contents thereof. A few of such cases are *Serena v. Rubin*, 146 Kan. 603, 72 P. 2d 995; *Fry v. Dewees*, 151 Kan. 488, 99 P. 2d 844; *Rutland Savings Bank v. Steele*, 155 Kan. 667, 127 P. 2d 471; *Dennett v. Meredith*, 168 Kan. 58, 64, 211 P. 2d 117. See, also, annotation in 4 A. L. R. 2d 492, 496.

A mineral deed is one which makes a severance, from the fee, of a present title to minerals in place. It is actually a realty conveyance. (*Richards v. Shearer*, 145 Kan. 88, 64 P. 2d 56; *Rathbun v.*

*Williams,* 154 Kan. 601, 121 P. 2d 243; *Hickey v. Dirks,* 156 Kan. 326, 327, 133 P. 2d 107.) On the other hand "royalty" in its ordinary meaning is that part of oil and gas payable to the lessor by the lessee out of oil and gas actually produced and saved. It is the compensation to the lessor provided in the lease for the lessee's privilege of drilling and producing oil or gas. It does not include a perpetual interest in and to the oil and gas in place. (*Bellport v. Harrison,* 123 Kan. 310, 255 Pac. 52; *Burden v. Gypsy Oil Co.,* 141 Kan. 147, 40 P. 2d 463; *Rutland Savings Bank v. Steele,* supra; *Rathbun v. Williams,* supra.) It is not uncommon to find "royalty" shortly defined as "a share" in production "paid." (Anno. 4. A. L. R. 2d 492, 497.) It is personal property. (*Hickey v. Dirks,* supra, and cases therein cited.) The lessee's interest in the oil produced, commonly seven-eighths or whatever the lease provides, is called the working interest. (*Robinson v. Jones,* 119 Kan. 609, 240 Pac. 957; *Davis v. Hurst,* 150 Kan. 130, 90 Pac. 2d 1100.)

In the Bellport case, *supra,* it was held:

"The ordinary meaning of the word 'royalty' in an existing oil and gas lease cannot be enlarged by proof of usage and custom so as to include a conveyance of oil and gas in place in the land and the perpetual right to go upon the premises to explore for and produce oil and gas." (Syl. ¶ 2.)

The cardinal principle or test to be applied in the interpretation of such instruments, as in others, is the intention of the parties. (*Rutland Savings Bank v. Steele,* supra.) Although all parts of the instrument are to be considered the granting clause is, of course, paramount in determining what interest was intended to be granted. (*Hickey v. Dirks,* supra, p. 330.)

No dispute of any consequence actually exists among the parties concerning the soundness of these long established principles and guides. Where they part company is in their application.

We turn to the first instrument set forth. While it may be debatable whether the first part of the granting clause constitutes a grant of one-fourth interest in and to all of the landowner's right and title to the oil and gas in place which they then owned or whether that part of the instrument alone constitutes merely a grant of an interest in oil or gas produced and saved, we must ascertain the intent of the instrument as disclosed by all provisions within its four corners.

The clause included a grant of an interest in rent. In the oil and gas industry rent is ordinarily money which a lessee pays to the owner of land in lieu of drilling. The provision pertaining to rent

is in harmony with a grant of an interest in and to oil and gas in place but being a grant of an interest in money, personal property, it is not conclusive of intent to make a grant of oil and gas in place. It is a factor to be considered together with others in determining intent.

It will be observed the granting clause also conveyed, ". . . a perpetual and irrevocable right, privilege and license to enter upon said land . . . and drill wells for oil and gas . . ." provided it did not interfere with the existing oil and gas lease on the premises. Long prior to the trial the Crawford oil and gas lease, existing at the time this instrument was executed, had been released. Two other oil and gas leases executed after the release of the Crawford lease were also terminated and at the time of trial there was no oil or gas lease or production on the premises. Under these conditions, we think the grantee had a "perpetual and irrevocable right" in and to one fourth of whatever oil and gas might exist in and under the land. That conclusion is fortified by the proviso of the granting clause under which the grantors might, under the conditions therein stated, receive three fourths of the net profits of the sale of the oil and gas. That provision, it appears, can be harmonized only with the intent of the grantors to convey the other undivided one-fourth interest of the oil and gas in place to the grantee. Such a grant conveyed an interest in the land.

Since the grantee had an interest in the land the court properly refused to quiet the landowner's title with respect thereto. The trial court concluded Hall had a one thirty-second interest in and to the oil and gas in place. It, apparently, but we think erroneously, calculated that fractional interest on the theory of one fourth of one eighth, that is one fourth of the grantors' royalty, which would be one fourth of the grantors' share in production. Hall, however, has not appealed from the judgment determining the extent of his interest in and to the oil and gas in place and we fail to see how we can disturb the extent of his interest as determined.

This brings us to the second instrument set forth. Here the interest conveyed is ". . . an undivided one-fourth (¼) in a certain oil and gas mining lease. . . ." Under the mining lease referred to the grantee, Stanley, was entitled to one fourth of the oil and gas "royalties reserved to the lessors." That meant the grantors conveyed one fourth of one fourth or one sixteenth of the oil and gas produced. This was an interest in personal property and not title to oil and gas in place.

It was stipulated the oil and gas lease on the land had been terminated and that no other lease was now in force and effect.

In determining whether the grant was one of oil and gas in place, a conveyance of realty, it must be observed it was the lessors who expressly reserved the *exclusive right* to execute a new lease on the land on termination of the existing lease. That provision did not recognize any right of the grantee in the realty. It also was provided that under a new lease the grantee's interest should not be less than one sixteenth *of the production*. What the purpose was for using the words "not less" than one-sixteenth of the royalties is not entirely clear. Its purpose may have been to recognize the grant of an interest in bonuses. In any event the interest granted was an interest in personal property. The same paragraph contains its own recognition of the meaning of the word "royalties" in that it denominates the interest conveyed as one sixteenth of the *production* under a new lease.

Another factor worthy of note is the apparent interpretation W. H. Stanley, the grantee, placed thereon. The assignment of his interest to another reads:

"All of the undivided *one-fourth* interest in the one-fourth oil and gas *royalty reserved* to Ethel Johnson, a single woman, and George Johnson, a widower, in a certain oil and gas mining lease executed by said Ethel Johnson, .and George Johnson, widower, to E. E. Johnston. . . ." (Our italics.)

The appellee, Hall, reminds us this instrument granted a one-fourth interest in bonuses received by the grantors and that a bonus for a lease ordinarily passes to the owner of land. It is true that in a case holding an instrument did not constitute a conveyance of oil and gas in place we said that if an instrument conveys an interest in minerals in place the grantee is normally entitled to a corresponding share in such cash rentals and bonuses. (*Hickey v. Dirks,* supra.) From that decision, however, it does not follow that a grant of an interest in bonuses necessarily takes precedence over all other considerations and compels a conclusion it was a conveyance of oil and gas in place when the instrument considered in its entirety clearly shows it was intended to be only a grant of an interest in personal property, reserved to the lessor. It is also well to remember a grant of bonuses, or an interest therein, is ordinarily a grant of money, personal property, and not of reality. In principle a grant of an interest in bonuses is similar to a grant of an interest in rents, previously discussed herein. It is a proper factor to be considered in determining the intent of the grantor but it is not conclusive on

the question of the nature and character of the grant. We are forced to the conclusion this instrument did not constitute a conveyance of oil and gas in place but a grant of an interest in personal property.

What about the third instrument on which the bank relies? Its general nature and character is so similar in pertinent terms to the second instrument that reiteration of what has been said concerning the latter is unnecessary. In order to avoid confusion of thought it may be well to specifically direct attention to the fact the same grantors, Cline V. Eyestone and his wife, made the grant in both the first and third instruments and that both grants pertain to oil and gas rights on the same land. It also may be helpful to state again the lease existing on this land at the time this third instrument was executed had terminated, subsequent leases thereon had been released and there was no producing oil or gas well on the land at the time of trial. This third instrument, as the second instrument, did not constitute a grant of oil and gas in place.

Hall, however, directs attention to the stipulated fact that he had executed a subsequent oil and gas lease, now terminated, on this land to one John T. Crane on April 27, 1936, before this appellant landowner acquired his title to the land in May, 1946, and that there was production under such lease until June or July, 1947. It is the bank and not Hall which claims rights by virtue of this third instrument. The right to make a new lease was expressly reserved to the grantors under both the second and third instruments. Whatever right Hall had to make a new lease on this land was acquired by virtue of the first instrument which we have concluded granted rights to oil and gas in place. Under that instrument the grantors did not reserve the exclusive right to execute a new lease.

We now reach the appellant landowner's next contention. It relates to the provisions in the instruments which purport to grant an interest in royalties, rents and bonuses on other oil and gas leases which might be executed *in the future*. Appellant contends those covenants are personal covenants of the prior owners of the land, that they do not run with the land and hence do not bind him, a subsequent owner of the fee title.

As previously stated it is stipulated the lands described in all three conveyances are now free and clear of all oil and gas leases and there is no production on any of them. Appellant concedes such covenants, even as to future leases, would be binding on the owners

of the land who made them but contends they are not binding on him, a subsequent fee title owner. It has been held an assignment by the fee title owner of an interest in royalties, rents and bonuses that accrue under an existing lease, and a lease which "might be executed" in the future is valid between the parties thereto, both as to the existing lease and a subsequent lease where made by the same landowners. (*Miller v. Sooy*, 120 Kan. 81, 242 Pac. 140.) In the same case it was held that construing the instrument as being binding only with respect to the leases executed by the then land-owners, and not as running with the land, the instrument was not subject to attack on the ground it violated the rule against perpetuities.

The first instrument in the instant case does not in its terms bind the "grantors, *their successors and assigns.*" Although the granting clause, in both the second and third instruments, does not provide that "We, the undersigned, for ourselves, *our heirs and assigns*" grant, etc., there is language in each of those two instruments which makes it appear it may have been intended to convey such interests under subsequent leases executed by the grantors, "or their assigns."

We need not determine whether these instruments, or any of them, were intended to be binding on subsequent fee title owners. If such was the intention when would the grant of such future interests vest? Appellant or future fee owners might never execute another lease. There is nothing in any of the instruments which imposes a duty on them to do so. Under the last two instruments, at least, the fee title owner would not be precluded from doing his own developing. (*Miller v. Sooy*, supra; *Leydig v. Commissioner of Internal Revenue*, 43 F. 2d 494, 496.) Moreover there is no limitation of time within which a future lease would be required to be executed, if one were actually executed. It is, therefore, wholly problematical when, if ever, such an interest under future leases would vest. Such a grant violates the rule against perpetuities, a rule against too remote vesting. In 41 Am. Jur., Perpetuities and Restraints on Alienation, § 24, it is said:

"One of the essential elements of the rule against perpetuities is that at the time the future interest is created, it must appear that the condition precedent to vesting must necessarily happen, if it happens at all, within the period prescribed by the rule. . . A possibility, or even a probability, that the interest or estate may vest within that time is not enough, for, it is said, the question of probabilities does not enter into the equation. If by any conceivable combination of circumstances it is possible that the event upon which

the estate or interest is limited may not occur within the period of the rule, or if there is left any room for uncertainty or doubt on the point, the limitation is void."

The foregoing statement constitutes the well recognized rule which is in harmony with our own decisions. (*Klingman v. Gilbert,* 90 Kan. 545, 548, 135 Pac. 682; *Malmquist v. Detar,* 123 Kan. 384, 255 Pac. 42; *Beverlin v. First National Bank,* 151 Kan. 307, 98 P. 2d 200; *McEwen v. Enoch,* 167 Kan. 119, 204 P. 2d 736.)

The trial court properly held appellant's title should not be quieted insofar as interest in and to oil and gas in place, granted by the first instrument, is concerned, but it erred in refusing to quiet appellant's title as against rights claimed under the second and third instruments. The judgment is, therefore, affirmed in part and reversed in part and remanded to the district court with directions to enter judgment in harmony with the views herein expressed.